**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

IN RE:                            :        Chapter 7
    MDC SYSTEMS, INC.,        :
                            :
          Debtor.        :        Bky. No. 08-14669 ELF

# O P I N I O N

## I.  INTRODUCTION

Graf & Graf, P.C., an unsecured creditor of Debtor MDC Systems, Inc. ("the Debtor"),
has filed an objection ("the Objection") to Proof of Claim No. 4 ("the Claim") of Brandywine
Operating Partnership, L.P. ("Brandywine").  The Claim, filed in the amount of $1,071,024.53, is
based on the Debtor's pre-petition breach of a ten-year lease of commercial real property.  Graf
maintains that the Claim should be disallowed in its entirety.  Alternatively, Graf asserts that if
the Claim is not totally disallowed, it should be allowed only in the amount of $196,510.32
pursuant to the statutory "rent cap" provision, 11 U.S.C. §502(b)(6).  Brandywine agrees that the
"rent cap" applies, but calculates that the Claim should be allowed in the amount of $562,703.72.

For the reasons that follow, Graf's objection will be sustained, but only in part.  I reject
Graf's argument that Brandywine's Claim should be disallowed in its entirety.  In applying the
rent cap, I conclude that the allowed Claim should be reduced from $1,071,024.53 to
$400,171.94.

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  The Parties and their Lease

On or about July 31, 2002, Brandywine and the Debtor entered into a lease ("the Lease"), pursuant to which Brandywine leased to the Debtor, for a term of ten (10) years, 7,063 rentable square feet on the first floor of the building located at 300 Berwyn Corporate Park in Berwyn, Pennsylvania.  (See Ex. C-5).  Upon the commencement of the Lease term,[1] the Debtor was required to pay "Fixed Rent" of $12,507.00 per month, plus electric, for the first year.  The Lease provided for the Fixed Rent to increase each year.  (See Ex. C-5, ¶1(e)).

The Lease also provided for the Debtor to lease approximately 2,000 square feet of unfinished basement space for storage ("the Storage Space").  The Fixed Rent for the Storage Space was $7.00 per square foot or $1,166.67 per month ($14,000.00 annually).  (Id. at 29).

On June 24, 2004, approximately two (2) years after the Lease was executed, the parties executed the "First Amendment to Lease" ("the First Amendment") whereby the Debtor relinquished 1,300 rentable square feet from the 2,000 square feet of Storage Space previously rented under the Lease (the remaining leased areas hereafter referred to as "the Premises").  (See First Amendment to Lease, Ex. C-5).  In accordance with the First Amendment, the Debtor's Fixed Rent for the Storage Space remained at $7.00 per square foot, but the monthly cost was

---

[1]      The Lease provided that its term would commence ("the Commencement Date") upon the earlier of the Debtor's possession or the substantial completion of the improvements Brandywine was required to make.  (Ex. C-5, ¶3(a)).  The Lease required the Debtor and Brandywine to confirm the Commencement Date by executing a "Confirmation of Lease Term," in the form attached to the Lease as "Exhibit B."  Id.  The record lacked an executed copy of a Confirmation Lease Term or any testimony regarding the Commencement Date.  However, I find that the Commencement Date was December 1, 2002.  I make this finding based on the fact that the Lease provided for an annual increase of "Fixed Rent" and both parties' proposed calculations show a rent increase occurring in December.  (Id. at ¶1(e); Graf Post Trial Br. at 4).

reduced to $400.33 per month ($4,900.00 annually).  Id.

At some point in either 2004 or 2005, the Debtor relinquished possession in favor of a related business entity, MDC Systems Corp. LLC ("the LLC"),[2] purportedly pursuant to an assignment of the Lease, an assignment that was not approved by Brandywine.

In or around July 2005, Brandywine notified the Debtor that it was in default for failing to pay rent and proper charges.  Soon thereafter, Brandywine commenced a lawsuit against the Debtor ("the State Court Case") in the Pennsylvania Court of Common Pleas, Chester County ("the State Court").  The matter was tried on August 6, 2007.

On November 19, 2007, the State Court entered judgment in favor of Brandywine and against the Debtor in the amount of $1,071,024.53 ("the State Court Judgment").  In its accompanying opinion, the State Court found that:

- as of July 2004, there were eight (8) years remaining of the Lease;

- the nonpayment of rent from April-June 2005 was a material breach of the Lease;

- the failure to pay certain expenses was an ongoing breach; and

- Brandywine did not agree to an assignment of the Lease to the LLC, as required by the Lease.

(See Ex. C-2).

On September 14, 2007, Brandywine initiated an ejectment action against the LLC, in which it alleged that the LLC was an illegal occupant/sub-tenant of the Premise.  On December

---

[2]      There is no dispute that the Debtor and the LLC have common ownership.

29, 2007, the LLC returned the keys to the Premises to Brandywine and vacated the Premises.[3]

After regaining possession of the Premises, Brandywine permitted two (2) new tenants to take possession.  Brandywine incurred "fit-up" costs for both new tenants.  The new tenants paid rent through July 2009.[4]

On July 23, 2008, MDC filed the present bankruptcy case under chapter 7 of the Bankruptcy Code.  On November 17, 2008, Brandywine filed the Claim at issue, in the amount of $1,071,024.53.

On May 1, 2009, Graf & Graf, P.C. ("Graf") an unsecured creditor of the Debtor, filed an objection to the POC.  (Doc. # 105).  Initially, by order dated July 7, 2009, I dismissed the Objection without prejudice in deference to the primacy of the chapter 7 trustee in the claims allowance and objection process.  (See Doc. # 120).  This decision was based on the principles set forth in Fred Reuping Leather Co. v. Fort Greene Nat. Bank, 102 F.2d 372, 372-73 (3d Cir. 1939) (general creditor of debtor has no right to contest another creditor's claim unless the trustee has refused to do so and creditor receives court permission); see also In re Morrison, 69 B.R. 586, 589 (Bankr. E.D. Pa. 1987) (creditor seeking to exercise trustee's authority to object to

---

[3]       In the second state court action, Brandywine also alleged the LLC and the Debtor's principal, Robert McCue ("McCue") were liable to Brandywine in connection an alleged fraudulent transfer of the Debtor's assets, purportedly made to avoid payment of the Debtor's obligations under the Lease.  That action was removed to the bankruptcy court and is now pending in the district court as a result of the district court's withdrawal of the reference on April 27, 2009.  See Brandywine Operating Partnership, L.P., v. MDC Systems, Inc., Adv. No. 08-317 (Bankr. E.D. Pa.), reference withdrawn sub nom. Kaliner v. MDC Systems, Corp., LLC, No. 09-MC-00005.

[4]       As with the Lease that is the subject of this contested matter, the new tenants' rent included a component for "CAM," a term that undoubtedly refers to "common area maintenance" charges.

a claim must establish that the trustee's failure to act is an abuse of discretion).[5]  More than a

year later, on November 16, 2010, Graf renewed its request for authority to press the Objection.

After conducting several hearings, and based on circumstances that had changed since July 2009,

I granted Graf's request by order dated May 23, 2011.  (See Doc. # 162).

A hearing on the Objection was held and concluded on December 16, 2011.  Thereafter,

the parties filed post-trial submissions, the last of which was filed on February 8, 2012.


## III.  GENERALLY APPLICABLE LEGAL PRINCIPLES

### A.  The Parties' Respective Burdens of Proof

Pursuant to 11 U.S.C. § 502(a), a proof of claim is deemed allowed unless a party-in-

interest objects.  Previously, I have explained the competing burdens of the parties in a contested

matter based on an objection to a proof of claim as follows:

> if a proof of claim complies with the Rules of Court and is self-sustaining (i.e., it
> sets forth the facts necessary to state a claim and is not self-contradictory), it
> is prima facie valid and the objecting party has the burden of producing evidence to
> refute the claim. That evidence, if believed, [must] refute at least one of the
> allegations that is essential to the claim's legal sufficiency.  If the objector meets
> that burden of production, the claimant must produce evidence to prove the
> validity of the claim, because the ultimate burden of persuasion is always on the
> claimant.

In re Wells, 463 B.R. 320, 326 (Bankr. E.D. Pa. 2011) (internal quotations and citations omitted);

see also  Fed. R. Bankr. P. 3001; In re Sacko, 394 B.R. 90, 98 (Bankr. E.D. Pa. 2008).

In this case, the State Court Judgment that is the basis for the Claim was attached to

---

[5]        In citing Morrison, I do not necessarily endorse the "abuse of discretion" standard
articulated in that opinion.

Brandywine's proof of claim and Graf does not dispute that the Claim is <u>prima facie</u> valid

pursuant to Rule 3001(f).  As a result, as the objector, Graf has the burden of production of

evidence that would establish that the claim should be disallowed or reduced.  Graf has attempted

to meet that burden primarily by offering evidence that the Claim is subject to reduction under 11

U.S.C. §502(b)(6), a position that Brandywine has not contested.[6]

The question still remains, however, as to which party has the burden of proof under

§502(b)(6).  One court has suggested that a §502(b)(6) claims objection is in the nature of an

affirmative defense and that the objector has the burden of proving that §502(b)(6) applies to

reduce the claim.  <u>See</u> <u>In re Dronebarger</u>, 2011 WL 350479, at *6-7 (Bankr. W.D. Tex. Jan. 31,

2011).  I agree with the analysis in <u>Droneberger</u>.  Therefore, I hold that Graf has the burden of

proof with respect to all issues under §502(b)(6) in this contested matter.


### B.  11 U.S.C. §502(b)(6)  – Generally

11 U.S.C. §502(b)(6) provides:

> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section,
> if such objection to a claim is made, the court, after notice and a hearing, shall
> determine the amount of such claim in lawful currency of the United States as
> of the date of the filing of the petition, and shall allow such claim in such
> amount, except to the extent that–

•  •  •

---

[6]    By its terms, 11 U.S.C. §502(b)(6) applies to claims for damages "resulting from
termination of a lease of real property."  Query whether the State Court Judgment, obtained by
Brandywine, arguably, prior to termination of the Lease, is a claim resulting from <u>termination of the
Lease</u>, as opposed to damages arising from a mere <u>breach of the lease</u>?  Based on the positions taken by
the parties in this litigation, that interesting question is not presented.

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds --

   (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of--

      (i) the date of the filing of the petition; and

      (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

   (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates . . . .

Section 502(b)(6) imposes a ceiling or "cap" on the allowance of a landlord claim for damages resulting from the termination of a lease of real property.  Section 502(b)(6) does not impact the amount of the landlord's claim; it determines only the _allowed_ amount of the claim. The claim, independent of the allowance process under §502(b)(6), must be determined first under applicable non-bankruptcy law and then compared with and, if necessary, reduced to the statutory maximum provided in §502(b)(6).  See, e.g., In re Peters, 2004 WL 1291125, at *2 (Bankr. E.D. Pa. May 7, 2004).

The purpose of the rent cap is to balance the interests of landlords and unsecured creditors by allowing a landlord "to receive compensation for losses suffered from a lease termination while not permitting a claim so large as to prevent general unsecured creditors from recovering from the estate."  Id. at *2 n. 11 (citing In re PPI Enterprises (U.S.), Inc., 324 F.3d 197 (3d Cir. 2003)).

There are three (3) threshold requirements under 11 U.S.C. §502(b)(6).  The claim must be: (1) of a lessor  (2) for damages arising from the termination of a lease, (3) of real property.

In a nutshell, if §502(b)(6) is applicable, it mandates that the creditor's claim (enforceable under applicable nonbankruptcy law and therefore, otherwise allowable) must be compared to the sum of two (2) amounts.  The first amount, "rent reserved" (referred to hereafter as "the Rent Reserved") is for "future rent," calculated based on a formula set forth in §502(b)(6)(A) and measured from a specific date, as discussed more fully below, and to which I shall refer as "the Rent Cap Date."[7]

The Rent Cap Date is either the date of the filing of the bankruptcy petition or the date on which the lessor "repossessed" or the lessee "surrendered" the leased property, whichever is earlier.  See 11 U.S.C. §502(b)(6)(A)(i), (ii).

Once the Rent Cap Date is determined, the Rent Reserved is computed by calculating the

---

[7]      The term "rent reserved" is not defined in the Bankruptcy Code.  The Third Circuit has not ruled on the issue, but has observed that courts generally define rent to be a "fixed regular, periodic" obligation.  First Bank Nat. Assoc. v. Federal Deposit Ins. Corp., 79 F.3d 362, 369 (3d Cir. 1996) (citing In re Conston Corp., 130 B.R. 449, 455 (Bankr. E.D. Pa. 1991)).  The Ninth Circuit Bankruptcy Appellate Panel has devised a three-part test for determining when a charge should be "rent reserved" within the meaning of § 502(b)(6)(A):

The charge must be:

(1) (a)  designated as "rent" or "additional rent" in the lease; or
    (b) provided as the tenant's/lessee's obligation in the lease;

(2) related to the value of the property or the lease thereon; and

(3) a fixed, regular or periodic charge.

In re McSheridan, 184 B.R. 91, 99-100 (B.A.P. 9th Cir. 1995), overruled, in part, In re El Toro Materials, Co., Inc., 504 F.3d 978, 981-82 (9th Cir. 2007).  Several courts in our circuit have adopted this test. Peters, 2004 WL 1291125, at *6 n. 21; Blatstein, 1997 WL 560119, at *13; In re Fifth Ave. Jewelers, 203 B.R. 372, 381 n.11 (Bankr. W.D. Pa. 1996); see also Eric D. Winston & Nathan A. Schultz, Sizing Up the "Cap" Commercial Lease Rejection Claims in Bankruptcy, 27 Cal. Bankr. J. 209, 218 (2004) (stating that the term includes rent, insurance, taxes, common area maintenance charges that are "fixed, regular and/or periodic") ("Winston & Schultz").

greater of: (a) the rent reserved under the lease for one (1) year, or (b) fifteen (15) percent, not to exceed three (3) years, of the remaining term of the lease.

The second amount that must be determined is the amount of unpaid rent, without acceleration, that fell due as of the Rent Cap Date  (referred to hereafter as "the Unpaid Rent"). Section 502(b)(6)(B) provides for the allowance of the full amount of the Unpaid Rent; there is no limitation.  In re Smith, 249 B.R. 328, 336 (Bankr. S.D. Ga. 2000) (citing 4 Collier on Bankruptcy ¶502.03[7][e] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) ("Collier")).

If the claim that otherwise would be allowable under applicable nonbankruptcy law, exceeds the sum of the Rent Reserved and the Unpaid Rent, the allowed claim is reduced to the lower amount.

## IV.  ANALYSIS

### A.  The Parties' Competing Rent Cap Calculations

Brandywine and Graf disagree as to the proper application of the rent cap calculation and, consequently, derive very different amounts allowable under the statute.  Brandywine claims that its total allowable claim subject to the rent cap of §502(b)(6) is $562,703.72,[8] while Graf asserts that Brandywine's has no valid claim, but in no event does the allowable claim exceed

---

[8]        (See Ex. C-4 at 1-2).  Brandywine's original Proof of Claim attached the opinion and order of the State Court.  (See Exs. C-2 & C-3).  Exhibit C-4 entitled "Estimate of Amounts Due Under Lease Between Debtor and Brandywine Operating Partnership, L.P." is a five (5) page document and the Revised Proof of Claim provided by Brandywine.  Only the first two (2) pages are relevant.  (See N.T. at 218; Brandywine's Pretrial Statement at ¶ 2 and Ex. A attached thereto).

$196,510.32.[9]

As explained below, the parties' most significant (but by no means only) disagreement involves the Rent Cap Date.  They also disagree on the computation of both the Rent Reserved and Unpaid Rent, as well as whether obligations included in the State Court Judgment that arguably are not "rent," such as expenses incurred in re-letting the Premises and attorney's fees and costs, are allowable.

**B.  The Rent Cap Date**

**1.**

The Rent Cap Date begins on the date of the filing of the bankruptcy petition, unless there is an earlier surrender or repossession of the property.  <u>See</u> 11 U.S.C. §502(b)(6)(A)(i), (ii).  The date selected can have a significant impact on the allowed amount under §502(b)(6).  If an earlier date is applicable, there is a shorter period in which unpaid rent might have accrued.  Further, the calculation of the rent reserved also is likely to decrease due to the fact that most long-term leases provide for the rent to increase over the term.  Consequently, if the calculation of the projected rent is carried forward to a later period of the lease term, it is likely to reach a period in the lease term in which the rent has increased.

Not surprisingly, as the objector, Graf argues that the Rent Cap Date precedes the filing of the bankruptcy petition, <u>i.e.</u>, December 29, 2007, the date the LLC delivered the keys to the Premises to Brandwyine.  Brandywine contends that the proper Rent Cap Date is July 23, 2008, which is the date the Debtor filed its bankruptcy petition.  Thus, this aspect of the parties' dispute

---

[9]    (<u>See</u> Graf Post-Trial Memorandum of Law 41).

concerns a period of approximately seven (7) months.

The Rent Cap Date will precede the filing of the bankruptcy petition if there was a pre-petition "surrender" or "repossession" of the leased premises.  Under Pennsylvania law, a surrender "is the yielding up of the estate prior to its expiration to the person who has the immediate reversion, so that the leasehold interest becomes extinguished by <u>mutual</u> <u>agreement</u> of the parties."  30-2 <u>Pa. Real Estate Law Encyclopedia</u> §154 (LEXIS 2012) (emphasis added) (citing <u>In re Allegheny, Int'l, Inc.</u>, 13 B.R. 396, 404 (Bankr. W.D. Pa. 1991)).  For a surrender to a occur, the landlord must accept the surrender.  <u>Stonehenge Square Ltd. P'ship v. Movie Merchs., Inc.</u>, 685 A.2d 1019, 1023 (Pa. Super. Ct. 1996) (citing <u>Hochman v. Kuebler</u>, 53 Pa. Super. 481, 484 (Pa. Super. Ct. 1913)), <u>aff'd</u> 715 A.2d 1082 (Pa. 1998); <u>see also</u> <u>Ralph v. Deiley</u>, 141 A. 640, 642 (Pa. 1928) ("[s]urrender is a contractual act, and it occurs only through the consent of both parties").  The determination of an acceptance is a question of the landlord's intent.  <u>Hirsh v. Carbon Lehigh Intermediate Unit #21</u>, 2003 WL 23580350, at *403 (Pa. Comm. Pl. Lehigh Co. Dec. 5, 2003).   The effect of a surrender is "to pass the estate of the tenant to the landlord, extinguishing the rent reserved."  <u>Peters</u>, 2004 WL 1291125, at *3 (quoting <u>Ralph</u>, 141 A. at 642).

Graf argues that, in accordance with Pennsylvania law, Brandywine accepted the Debtor's surrender of the Premises when the LLC returned the keys to Brandywine on December 29, 2007 and Brandywine thereafter leased the Premises to new tenants.  (Graf Post-Trial Br. at 31-34).[10]

---

[10]     According to Graf, such surrender effectuated a termination of the Lease as of that date and forecloses Brandywine's entitlement to future rent thereafter.  I will return to the question of

(continued...)

Brandywine contends that there was no surrender of the Premises under Pennsylvania law because there is no evidence of a mutual agreement between Brandywine and the Debtor that Brandywine's acceptance of the keys and possession of the Premises acted as a termination of the Lease.  Brandywine further argues that under Pennsylvania law, its re-letting of the Premises did not terminate the lease.[11]

On grounds different than those presented by the parties, I conclude that Graf is correct: December 29, 2007 is the Rent Cap Date.

---

[10](...continued)
Brandywine's right to future rent after taking possession of the Premises in Part C.1, <u>infra</u>.

[11]      In making this second argument, Brandywine looks to the Lease, which provides that Brandywine could obtain possession of the Premises without terminating the Lease and that if Brandwyine re-let the Premises, the associated costs would be recoverable from the Debtor. (<u>See</u> Brandywine Br. at 14).

Brandywine also relies heavily on the <u>Peters</u> decision, in which the court rejected the debtor's argument that the re-letting of the premises constituted the landlord's acceptance of the debtor's surrender.  The court reasoned that the re-letting of the premises after the tenant gives up possession effects a surrender only if the new lease is hostile to the original lease:

> Under such circumstances, the landlord has created a new lease that is independent of an inconsistent with the original lease, thereby abrogating the original lease.  Thus, whether reletting of a premises effects a surrender depends upon whether the new and original leases are independent of an inconsistent with each other.  If the two leases are dependent and consistent with one another, it demonstrates that the reoccupation and reletting was for the benefit of the tenant and that the landlord did not accept the surrender.

<u>Peters</u>, 2004 WL 1291125, at *4.

**2.**

The issue presented is whether a "surrender" or "repossession" occurred on December 29, 2007.  Neither of these terms is defined in the Bankruptcy Code.  In making their respective arguments, both parties have assumed that the act of "surrender" under 11 U.S.C. §502(b)(6)(A)(i) is determined by applicable nonbankruptcy law  –  in this case, the law of Pennsylvania.

The parties' assumption is not unreasonable.  Most courts have looked to state law to determine whether a lease has been surrendered or repossessed.  See, e.g., In re Lomax, 194 B.R. 862, 866 (B.A.P. 9th Cir. 1996); 1500 Mineral Spring Assocs., LP v. Gencarelli, 353 B.R. 771, 786 (D.R.I. 2006); In re Titus & McConomy, LLP, 375 B.R. 165, 171 (Bankr. W.D. Pa. 2007); In re Schembrie, 2007 WL 2848566, at *5 (Bankr. W.D. Wash June 29, 2007); Peters, 2004 WL 1291125 at *3; Smith, 249 B.R. at 335; Fifth Ave. Jewelers, 203 B.R. at 377-78; In re Iron-Oak Supply Corp., 169 B.R. 414, 417-18 (Bankr. E.D. Cal. 1994).

Respectfully, however, I do not agree with the parties' joint premise or the majority view that the meaning of the term "surrender" under §502(b)(6) of the Bankruptcy Code is governed by state law.  In my view, the text, structure and purpose of §502(b)(6) mandate that the term be given the more ordinary, dictionary-like definition: "The act of yielding to another's power or control."  Black's Law Dictionary 1484 (8th ed. 2004).  Under this definition, the voluntary delivery of possession of the leased premises constitutes "surrender" within the meaning of §502(b)(6) and the Debtor "surrendered" the Premises when it and its sublessee (the LLC) vacated the Premises and Brandywine took possession of the Premises on December 29, 2007.

I adopt this interpretation of §502(b)(6) based primarily on the reasoning of two (2)

13

authorities.  The first is a prior bankruptcy court decision in this district, In re Main, Inc., 1997

WL 626544 (Bankr. E.D. Pa. Oct. 7. 1997).  There, the court stated:

> Section 502(b)(6) presumes that "rent reserved" exists. Were there no "rent reserved," the landlord would have no claim for rent at all. Therefore, a §502(b)(6) calculation presumes that the landlord's claim for rent has not been eliminated. However, the Pennsylvania law referenced by the Superior Court and the District Court considered the issues of "surrenders" and "repossession" solely in the context of whether the tenant's entire liability for rent <u>was</u> eliminated.
>
> As a result, **it appears not only unlikely but impossible that the Pennsylvania state law concept of "surrender" or "repossession" and the § 502(b)(2)(A)(ii) concept of these terms could be identical. Whenever rent is due, under the reasoning of Blatstein I, there will be no "surrender" or "repossession" to stop the running of the rent due pursuant to § 502(b)(6)(A)(ii). Under this reasoning, the only event which could trigger cessation of "rent reserved" is the filing of a bankruptcy petition, bringing § 502(b)(6)(A)(i) into play. In effect, § 502(b)(6)(A)(ii) would never be applicable**.
>
> We therefore submit that **the only logical reading of § 502(b)(6)(A)(ii) requires a conclusion that an event which is insufficient to eliminate the landlord's future rent claim may give rise to a § 502(b)(6)(A)(ii) date**. In no sense should the state law determination of whether a "surrender" or "repossession" occurred such as would eliminate any future claim for rent reserved control the § 502(b)(6)(A)(ii) determination.

Main, 1997 WL 626544, at *7 (emphasis added).

A few years after <u>Main</u> was decided, a commentator urged the same result, reasoning as

follows:

> [I]t is far from clear that state law should control the meaning of "surrender" and "repossession" as those terms are used in Bankruptcy Code section 502(b)(6)(A). To the contrary, there is a strong argument that those terms have a unique federal meaning.
>                                          .  .  .
> The fact that Congress decided to measure the limitation on the "future
>
> rent" portion of a lease termination claim by the earlier of "lessee's surrender," "lessor's repossession," and the petition date is telling, for at least three reasons.

14

First, it indicates that Congress did not view "lessee's surrender" or "lessor's repossession" to mean the same thing as "lease termination." Had Congress intended for "surrender" or "repossession" to mean "lease termination," it could have said so by defining the "future rent" component in section 502(b)(6)(A) with reference to the earlier of lease termination or the petition date.

Second, in the statute, Congress modified the term "surrender" by the word "lessee" and modified the term "repossession" by the word "lessor." These modifications indicate that Congress intended for "future rent" claims be measured from the surrender date, <u>as determined by the tenant's acts</u>, or the date of "repossession," <u>as determined by the landlord's acts</u>. Were the term "surrender" to encompass a landlord's acceptance, it would be inaccurate to modify "surrender" by the term "lessee" because the act of surrender could not occur without the participation of the landlord.

Third, the term "surrender" is used in one other place in the Bankruptcy Code -- section 365(d)(4) **. . . .**

Section 365(d)(4) . . . requires a trustee to *surrender* leased property subject to a rejected lease to a landlord. The use of "surrender" in sections 365(d)(4) and 502(b)(6) should be identical. Yet applying the state law concept of "surrender" to section 365(d)(4) necessarily leads to an absurd result -- if "surrender" requires both abandonment and a landlord's acquiescence, how can a trustee comply with section 365(d)(4) if the landlord does not acquiesce to the "surrender?" Not surprisingly, courts interpreting section 365(d)(4) have impressed a federal meaning to its use of the word "surrender." The Ninth Circuit has held that under section 365(d)(4), a debtor must physically surrender the leased property to the landlord even if state law would otherwise require the landlord to seek additional remedies.

Winston & Schultz, 27 Cal. Bankr. J. at 226-27 (emphasis in original) (footnotes omitted).

The <u>Main</u> court's reasoning is that use of state law leads to an absurd result: a surrender would eliminate the landlord's claim entirely, making it unnecessary to "cap" the claim for future rent, thus rendering §502(b)(6)(A) superfluous.  The Winston & Schultz commentary focuses on a textual analysis of related sections of the Bankruptcy Code.  To those cogent points, I would add only that the use of the common meaning of the term surrender is consistent with the purpose

15

of §502(b)(6), which is to reduce a landlord's claim for the period of time in which a valid state

law claim for rent exists, but after the leased premises ceases to provide any benefit to the debtor

or the bankruptcy estate.   That purpose is best achieved by treating the term as an issue of federal

law, not state law, a result consistent with the construction of other provisions of the Bankruptcy

Code.   See, e.g., In re Berman, 629 F.3d 761, 767 (7th Cir. 2011) ("The existence of a fiduciary

relationship under section 523(a)(4) is a matter of federal law."); In re McCormick, 283 B.R.

680, 683 (Bankr. W.D. Pa. 2002) ("Federal law controls who is a fiduciary for purposes of §

523(a)(4)") (citations omitted).

For these reasons, I hold that a surrender under 11 U.S.C. §502(b)(6) occurs when a

tenant vacates and the landlord takes possession the leased premises.   Here, the Debtor

surrendered the Premises to Brandywine on December 29, 2007.   On that date, the LLC vacated

the Premises by turning in the keys to Brandywine and Brandywine took possession of the

Premises.[12]

## C.  The Rent Reserved: 11 U.S.C. §502(b)(6)(A)

### 1.

Before calculating the Rent Reserved, I must address a threshold argument made by Graf:

that the Rent Reserved is $0.00.

Graf contends that Brandywine's act of filing the ejectment action in December 2007

terminated the Lease and eliminated the Debtor's obligation to pay any ongoing, future rent.   In

---

[12]      Because of the close relationship between the LLC and the Debtor, I impute the LLC's
actions to its putative sub-lessor, the Debtor.

other words, Graf posits that Brandywine necessarily terminated the Lease when it demanded

immediate possession of the Premises (by filing the ejectment action against the LLC) because,

under Pennsylvania law, a landlord cannot both seek possession of a leasehold before the end of

a term and collect future rent.  (See Graf Post Trial Br. at 24-30).

Respectfully, I disagree with Graf's contentions that Brandywine's initiation of the

ejectment action in December 2007 establishes that the Lease was terminated and that

Brandywine thereafter forfeited its right to collect rent.

Under Pennsylvania law, ejectment is a possessory action and can succeed only if the

plaintiff is out of possession and has a present right to immediate possession.  Brennan v. Shore

Bros., Inc., 110 A.2d 401, 403 (Pa. 1955).  In the case of a landlord, "an ejectment action cannot

be commenced  . . .  until the lease term has expired and/or there has been a forfeiture of the lease

sufficient to terminate it."  Ronald M. Friedman, Pennsylvania Landlord-Tenant Law and

Practice, §4.12 at 290 (George T. Bisel Company, Inc., 3rd ed. 2001) ("Friedman").

In order to seek possession based on a tenant's breach of the lease, the landlord must

declare a forfeiture and termination of the lease based upon the breach.  Breaches of a lease

agreement that might be sufficient to cause a forfeiture include failure to pay rent and assignment

of the lease.  See, e.g., Burke v. Bryant, 128 A. 821 (Pa. 1925).  However, a breach of a lease

does not automatically provide the landlord with the right to commence an ejectment action.  As

explained in one treatise:

> The termination of the lease and the right to commence an ejectment action
> cannot accrue to the landlord until there is compliance with the notice
> requirements and forfeiture procedures, if any, that are set forth in the lease
> agreement.  Once the default occurs that may result in a forfeiture, the landlord
> must move to terminate the lease even if there is no notice requirement or

> forfeiture procedure set forth in the lease.  **The reservation of the right to**
> **terminate the lease upon the default of the tenant is not self-operative.  That**
> **is, the lease does not automatically terminate upon the default.  The landlord**
> **must take some affirmative action to exercise the remedy of termination**.
> Until this is done, the lease is not terminated, the landlord does not have the right
> of immediate possession of the leased premises, and no action in ejectment can be
> maintained.

Friedman §4.12 at 290 (emphasis added) (footnote omitted).

The record in this contested matter does not support a finding that Brandywine attempted to terminate the Debtor's lease when it initiated the ejectment action.

Significantly, the ejectment action was filed against the LLC, an entity that Brandywine considered to be an unlawful assignee, and not against the Debtor.  I perceive no inherent inconsistency with an attempt to eject an unlawful third-party occupant of a property and the ongoing viability of landlord-tenant lease.

Further, there is no documentary evidence that Brandywine took any affirmative action to terminate the Lease as a prerequisite to filing the ejectment action.  The record reveals only that Brandywine did not agree to the assignment to the LLC, that the State Court Judgment was based on a monetary breach of the Lease, and that approximately one (1) month after the entry of the State Court Judgment, Brandywine filed the ejectment action, the LLC vacated the premises and returned the keys to Brandywine.  Indeed, Brandywine never even obtained a judgment in ejectment.  Nothing in this sequence of events constituted a termination of the Lease.

Absent a termination of the Lease, Graf's argument, that the Debtor was not liable for any further rent, fails.

**2.**

Having rejected Graf's argument that no future rent after December 29, 2007 is

allowable, I turn to the computation of the Rent Reserved.

Under 11 U.S.C. §502(b)(6), a landlord is entitled to such rent reserved, without

acceleration, for the greater of (1) one year or (2) 15 percent, not to exceed three years, for the

remaining lease term.  §502(b)(6)(A).  Of the two (2) formula options set forth in §502(b)(6)(A),

the parties agree that the appropriate measure of the Rent Reserved is the rent reserved by the

Lease for one (1) year.  I will accept the parties' agreement on this point, making it unnecessary

to consider the "15 percent" alternative.  Accord Collier ¶ 502.03[7][c] at 502-45; Peters, 2004

WL 1291125, at *6 n. 20 (citing Iron-Oak Supply, 169 B.R. at 410 n. 8)).  Instead, I will

calculate the one (1) year of "rent reserved" from January 1, 2008.[13]

From January 2008 to December 2008, the basic rent stayed the same until it increased

from $13,978.85 to $14,273.15 in the last month.  Thus, for eleven (11) of the twelve (12)

months, the Rent Reserved consisted of the following amounts.

| | |
|---|---|
| (1) Basic Rent | $13,978.85 |
| (2) Storage | $    400.32 |
| (3) CAM | $    215.82 |

Employing these figures, I calculate the Rent Reserved to be **$175,434.18**:

| | |
|---|---|
| $ 13,978.85 | Basic Rent |
| +        400.32 | Storage |
| +        215.82 | CAM |
| **$ 14,594.99** | |

---

[13]        I account for the rent due for the entire month of December 2007 in the "Unpaid Rent"
portion of this Opinion.  Therefore, I am not concerned with the two (2) days remaining in December
after the date of surrender and calculate the rent reserved from January 1, 2008.

| | | |
|---|---:|---|
| x | 11 | January 1, 2008 through November 30, 2008 |
| | $160,544.89 | **Sub-total** |
| + | $ 14,273.15 | December 2008 Basic Rent |
| + | 400.32 | Storage |
| + | 215.82 | CAM |
| | **$175,434.18** | **Total** |

Graf does not dispute that the charges listed in the above calculation all are properly

categorized as rent includable in the Rent Reserved.   However, Graf disputes the accuracy of the

CAM charges, arguing that the were not calculated in accordance with Article 6 of the Lease.

(See Graf Post Trial Br. at 9-10).  More specifically, Graf argues that there were components of

the figure for CAM that should not have been included:

> Since the lease did not authorize Claimant to pass through to Debtor the expense
> incurred to clean premises of other tenants, and Claimant was passing those
> charges through to Debtor, Claimant's computation of CAM charges was in
> violation of the lease. Claimant was over-charging Debtor for the janitorial
> component of CAM.

(Id. at 10).

As previously stated, when a proof of claim has prima facie validity, it is the objector's

burden "to produce evidence and show facts tending to defeat the claim by probative force equal

to that of the allegations of the proofs of claims themselves."  Sacko, 394 B.R. at 97-98 (quoting

In re Holm, 931 F.2d 620, 623 (9th Cir. 1991)).  Further, to the extent Graf's dispute of the

allowability of the CAM charges as part of Rent Reserved is conceptualized as a §502(b)(6)

issue, Graf bears the burden of proof.  Here, Graf did not meet its burden.  Graf came forward

with no evidence to support its assertion that Brandywine overcharged the Debtor in calculating

the CAM charges.  Therefore, the CAM charges are allowable as "rent reserved."  See

McSheridan, 184 B.R. at 99-100; Peters, 2004 WL 1291125, at *6 n. 21.

20

Thus, the Rent Reserved under §502(b)(6)(A) is **$175,434.18.**

### D.  The Unpaid Rent – 11 U.S.C. §502(b)(6)(B)

### 1.

11 U.S.C. §502(b)(6)(B) requires that the bankruptcy court determine the amount of the

unpaid rent (without acceleration) due under the lease as of the Rent Cap Date.  Prior to that date,

in this case, December 29, 2007, Brandywine already had obtained the State Court Judgment  –  a

monetary judgment for both past and accelerated rent.

At the hearing in this contested matter, Brandywine offered into evidence Exhibit C-1,

which was an exhibit admitted into evidence in the State Court trial.[14]   Brandywine asserts that

Exhibit C-1 breaks down the State Court Judgment into its component parts.

Exhibit C-1 sets out the following itemization:

| | |
|---|---|
| Rent & additional rent and storage thru July 30, 2007 | $119,515.11 |
| Rent & additional rent and storage for August 2007 | $ 16,143.32 |
| Rent and additional rent and storage accelerated | |
| from September 1, 2007 through end of term | $840,128.83 |
| Interest on unpaid rent and additional rent | $ 11,652.72[15] |
| Attorneys' fees and costs: | |
| a. Through July 30, 2007 | $ 75,802.15 |

---

[14]      In the State Court, the exhibit was marked as Exhibit P-15.  In this opinion, I will refer to
it as Exhibit C-1.

[15]      In its computation at trial, (see Ex. C-4), Brandywine made no request for interest.  I will
treat that omission as an abandonment of any request for allowance of the interest component of the State
Court Judgment.

| | | |
|---|---|---|
| b. Estimated through end of trial | $ | 6,000.00 |
| c. Costs | $ | 1,782.40 |
| **Total Amount of Damages** | | **$1,071,024.50** |

(Ex. C-1).

Brandywine relies on Exhibit C-1 to establish three (3) propositions:

    (1) the State Court adopted Exhibit C-1 in making its decision;

    (2) Graf is precluded from disputing the amounts itemized on Exhibit C-1 based on the doctrine of issue preclusion; and

    (3) from Exhibit C-1, the bankruptcy court can compute the amount of the Unpaid Rent under 11 U.S.C. §502(b)(6)(B).

I agree, in large part, with Brandywine.  I conclude that:

    (1) the State Court adopted Exhibit C-1 in making its decision;

    (2) to the extent that Exhibit C-1 itemizes the amount of  unpaid rent for some of the period preceding the Rent Cap Date, Exhibit C-1 is preclusive in this contested matter;

    (3) Exhibit C-1 itemizes some, but not all, of the Unpaid Rent under §502(b)(6)(B); and

    (4) the amount of the Unpaid Rent not encompassed by Exhibit C-1 can be determined from other evidence in the record.

I explain the basis for each of these conclusions below.

**2.**

Exhibit C-1 calculates Brandywine's total damages to be $1,071,024.50. The State Court

Judgment is for three (3) cents more, $1,071,024.53.

The $0.03 difference between the calculation in Exhibit C-1 and the State Court

Judgment is <u>de minimus</u> and the near identity of the two amounts is not likely mere coincidence.

Therefore, I find it reasonable to draw the inference requested by Brandywine, <u>i.e.</u>, that in

awarding the State Court Judgment, the State Court adopted the calculation of Exhibit C-1 as its

findings. <u>See generally</u> <u>In re Kates</u>, 2012 WL 6584994, at *10 (Bankr. E.D. Pa. Dec. 18, 2012)

(employing a "deductive" methodology, bankruptcy court may consider additional materials from

first proceeding to ascertain what issues were actually litigated before and necessarily decided by

prior court).

**3.**

I conclude that the State Court's findings adopted from Exhibit C-1 are preclusive in this

adversary proceeding insofar as they are relevant in calculating the Unpaid Rent under 11 U.S.C.

§502(b)(6)(B).

Issue preclusion is based upon the policy that "a losing litigant deserves no rematch after

a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one

he subsequently seeks to raise." <u>Dici v. Commw. of Pa.</u>, 91 F.3d 542, 547 (3d Cir. 1996)

(quoting <u>Astoria Fed. Sav. & Loan Ass'n v. Solimino</u>, 501 U.S. 104, 107 (1991)).

The application of issue preclusion based on a prior state court judgment is grounded in

the full faith and credit statute, 28 U.S.C. §1738, which provides that state judicial proceedings

"shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." Accord Marrese v. Amer. Academy of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985); Kates, 2012 WL 6584994, at *9.  The general rule of issue preclusion prevents the re-litigation of issues that have been actually litigated to a valid and final judgment by the parties on either the same or a different claim.  See Hebden v. Workmen's Comp. Appeal Bd., 632 A.2d 1302, 1303 (Pa. 1993) (citing Pittsburgh v. Zoning Bd. of Adjustment, 559 A.2d 896, 901 (Pa. 1989)); Restatement (Second) of Judgments §27 (1982).

Under Pennsylvania law, in order for issue preclusion to apply, five (5) elements must be satisfied:

(1) an issue is identical to one that was presented in a prior case;

(2) there has been a final judgment on the merits of the issue in the prior case;

(3) the party against whom the doctrine is asserted was a party in, or in privity with a party in, the prior action;

(4) the party against whom the doctrine is asserted, or one in privity with the party, had a full and fair opportunity to litigate the issue in the prior proceeding; and

(5) the determination in the prior proceeding was essential to the judgment.

E.g., Spyridakis v. Riesling Group, Inc., 398 F. App'x 793, 797 (3d Cir. 2010) (nonprecedential); Jean Alexander Cosmetics, Inc. v.L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006); In re Jacobs, 381 B.R. 147, 161 (Bankr. E.D. Pa. 2008) (citing Cohen v. Workers' Comp. Appeal Bd.

(City of Philadelphia), 909 A.2d 1261, 1264 (Pa. 2006)).  But cf. Greenway Ctr., Inc. v. Essex

Ins. Co., 475 F.3d 139, 147 (3d Cir. 2007) (applying four-part test for issue preclusion, exclusive

of "essential to the judgment" element); Tucker v. Phila. Daily News, 848 A.2d 113, 120 (Pa.

2004) (same).

Graf makes no argument that any of the five (5) requirements for the application of issue

preclusion are lacking.  Instead, Graf makes two (2) weak arguments against the application of

the doctrine.[16]

First, Graf contends that because the Lease provided for arbitration of additional rent

disputes, the State Court lacked jurisdiction over the issue of "additional rent" due.  (See Graf

---

[16]       I note that while Graf did not raise the issue, arguably, there is some question whether
the "identity of parties" requirement is satisfied.  Brandywine's opposing party in the state court
litigation was the Debtor, not Graf.  Nonetheless, for purposes of this contested matter, Graf is in privity
with the Debtor.  See generally Ammon v. McCloskey, 655 A.2d 549, 554 (Pa. Super. Ct. 1995) (privity
refers to "mutual or successive relationships to the same right of property, or such an identification of
interest of one person with another as to represent the same legal right"); In re Mondelblatt, 350 B.R. 1, 8
(Bankr. E.D. Pa. 2006) (the concept of privity is an expression of a "conclusion that a nonparty's
relationship to the prior litigation is sufficient to justify the application of preclusion doctrines").

Initially, one must bear in mind that Graf is prosecuting this claims objection, with court
permission, on behalf of all creditors.  In effect, he is invoking a power usually reserved to the chapter 7
trustee.  Thus, it is fair to consider whether the chapter 7 trustee would have been bound by the State
Court's findings had the chapter 7 trustee prosecuted this claims objection, and not Graf.

The relevant case law instructs that, at least in the context of the claims allowance
process, the bankruptcy trustee (and the bankruptcy estate) are bound by state court judgments against
the debtor.  At least in the context of determining whether claims should be allowed against the estate,
the bankruptcy trustee does not have the right to "undo" the adverse effects of litigation between the
debtor and creditors.  See Teltronics Services, Inc. v. L M Ericsson Telecommunications, Inc., 642 F.2d
31, 37 (2d Cir. 1981); In re MarMc Transp., Inc., 2012 WL 3646944, at *2 (Bankr. D. Wyo. Aug. 23,
2012); In re Leroux, 216 B.R. 459, 469 (Bankr. D. Mass. 1997).  This principle may have less force in
other contexts, such as when the trustee brings an affirmative claim that arises under the Bankruptcy
Code against a party that prevailed in pre-petition litigation against the debtor.  See In re Fordu, 201 F.3d
693, 704-05 (6th Cir. 1999); In re DLC, Ltd., 295 B.R. 593, 602 (B.A.P. 8th Cir. 2003)).

Post Trial Br. at 15-17 & 23).  Putting aside that Graf does not explain why the State Court's asserted error in failing to defer the "additional rent" issue to an arbitrator nullifies the court's determination regarding other types of damages under the Lease that were outside the scope of the parties' arbitration agreement and therefore within the jurisdiction of the State Court, the argument overlooks an even more fundamental point.  The Debtor put at issue and actually litigated the scope of the State Court's jurisdiction.  The Debtor asked the State Court to defer to the arbitrator, but lost that issue on the merits.  If the State Court erred, the remedy was to seek reversal on appeal.  Thus, Graf's argument to this court, regarding the proper scope of the State Court's jurisdiction, is itself barred by the issue preclusion doctrine.  See, e.g., Celotex Corp. v. Edwards, 514 U.S. 300 (1995) (judgment creditors could not collaterally attack bankruptcy court's injunction on ground that the court lacked subject matter jurisdiction); Kraft v. El View Constr., Inc., 394 N.W.2d 365 (Iowa 1986) (under Iowa law, prior court's finding that it could exercise personal jurisdiction over party conclusive in second proceeding); see generally Bromwell v. Michigan Mut. Ins. Co., 115 F.3d 208, 212 (3d Cir. 1997) (dismissal for lack of jurisdiction is binding as to all matters actually decided).

Second, Graf argues that Exhibit C-1 was admitted at trial in the State Court only for the limited purpose of establishing the amount of attorney's fees incurred by Brandywine. Consequently, according to Graf, no reasonable inference can be drawn that in determining the damages that comprised the State Court Judgment, the State Court adopted the factual contentions of Exhibit C-1 regarding the amount of unpaid rent, additional rent and storage.  I

reject this argument because it was not supported by any evidence in the record.[17]   As a result, I

remain convinced that the entry of a judgment that was virtually identical to the amount of

damages compiled in Exhibit C-1 strongly suggests that the State Court relied upon the

itemization in the Exhibit in determining Brandywine's entitlement to damages and is therefore,

preclusive.


**4.**

Having decided that Exhibit C-1 is preclusive in this contested matter, I must now

ascertain the extent to which the itemization in Exhibit C-1 assists in the calculation of the

Unpaid Rent due as of the Rent Cap Date, December 29, 2007.

The amounts itemized in Exhibit C-1 can be classified into three (3) categories.

First, Exhibit C-1 identifies the amount due for unpaid rent, additional rent and storage

through August 2007.  That amount, $135,658.43 ($119,515.11 plus $16,143.32), is preclusive in

this contested matter and, undoubtedly, is part of the Unpaid Rent as of the Rent Cap Date.

Second, the Exhibit lists $840,128.83 for future, accelerated rent.  Indisputably, this

amount is not encompassed by §502(b)(6)(B) and must be excluded from the computation of the

Unpaid Rent.

---

[17]      In support of its argument, and without filing a motion for leave to supplement the trial
transcript, Graf attached an excerpt from the transcript of the State Court proceedings to its post-trial
brief.  This constituted an inappropriate attempt to supplement the trial record.  See In re MacDonald,
222 B.R. 69, 72 (Bankr. E.D. Pa. 1998); In re Blanchard, 201 B.R. 108, 114 n.1 (Bankr. E.D. Pa. 1996);
In re  Smith, 165 B.R. 398, 399 (Bankr. M.D. Pa. 1993);  In re Cook, 146 B.R. 934, 939 (Bankr. E.D. Pa.
1992).  In deciding this contested matter, I have not considered the additional evidence Graf improperly
submitted.

Third, Exhibit C-1 itemizes sums for interest and legal expenses totaling $95,237.27 ($11,652.72 plus $83,584.55), all of which fell due and were included in the State Court Judgment entered prior to the Rent Cap Date. The items in this third category constitute obligations arising from the Lease that fell due prior to the Rent Cap Date and therefore, satisfy the "temporal" requirements of Unpaid Rent under §502(b)(6)(B). Whether they constitute "rent under such lease" within the meaning of that Code subsection, or are otherwise allowable, is a separate question, which will be discussed below in Part IV.F, infra,.

In short, Exhibit C-1 provides a conclusive determination of the Unpaid Rent through August 2007: $135,658.43 (possibly supplemented by $83,584.55 in attorney's fee and costs through the entry of the State Court Judgment, see Part IV.F, infra). It remains necessary to compute the unpaid rent for September through December 2007.

**5.**

While Exhibit C-1 does not compile the rent owed from September through December 2007, it includes sufficient information from which those amounts can be determined.

In calculating the damages awarded, the State Court accepted Brandywine's statement of the August rent (including CAM, electric and storage) as $16,143.32. This monthly obligation was constant from September through November 2007. Therefore, the unpaid rent during that period was $48,429.96.

The unpaid rent for December 2007 is comprised of the same components as the prior months, with two (2) changes. First, the electric charges were omitted from the calculation.

28

Second, the annual basic rent increase occurred.  Thus, the unpaid rent for December was:

| | |
|---|---|
| Basic Rent | $13,978.85 |
| CAM | $   215.82 |
| Storage | $    400.32 |
| **Total Rent December 2007** | **$14,594.99** |

(Exhibit C-4).

Therefore, the remaining unpaid rent for the months September through December 2007

total $63,024.95.[18]

Graf disputes the accuracy of these amounts, questioning the CAM and electric charges

that were added to the basic rent.  For the reasons previously discussed in Part IV.C.2, the State

Court's findings regarding those charges are preclusive.

In addition, Graf asserts that the computation fails to credit payments allegedly made by

the Debtor in 2007.

Brandywine's calculation of the unpaid rent in 2007 credited the Debtor for a $85,435.37

in payments from January 28, 2007 through November 23, 2007.  (See Ex. C-4).  Graf contends

that this credit is understated because the Debtor actually paid Brandywine $155,198.37 over the

course of 2007.  Graf produced copies of eleven (11) checks made out to Brandywine totaling

$141,113.48, (all but one of which were on the front side of the check only).  (See Exhibit O-3;

---

| [18] | Sept. - Nov.  2007 | (16,143.32/mo  x 3 months) | $ 48,429.96 |
|---|---|---|---|
| | Dec. 2007 | ($ 14,594.99) | + $ 14,594.99 |
| | | **Total** | **$ 63,024.95** |

N.T. 12/16/2011 at 158; Graf Post Trial Br. at 7-8).  Graf also produced a check dated November

21, 2007 in the amount of $14,084.89 to account for the December 2007 rent.  (Exhibit O-3).

The initial issue here is the extent to which, if any, Graf's contentions are precluded by

the State Court's findings.  I conclude that issue preclusion applies to the period prior to August

2007, but does not apply to the August through November 2007 period.  The state court trial of

the Debtor-Brandywine dispute was held in early August 2007.  It is unlikely that the State Court

considered any evidence of payments made in early August and, undoubtedly, no evidence of

payments in later months could have been presented.

As for the evidence of payment that is not precluded (i.e., the checks in the August to

December 2007 period), Brandywine argues that Graf's evidence of Debtor payments is

unpersuasive, asking me to draw a negative inference from the failure to produce copies of the

backs of the checks.  Brandywine's argument is not unreasonable.  Nonetheless, as factfinder, I

resolve this issue in Graf's favor.  I am persuaded by the documentary evidence and testimony

that the Debtor made a series of rent payments to Brandywine in the August-December 2007

period, after the conclusion of trial in the State Court.

Based on Exhibit O-3, I find that the Debtor is entitled to a credit for payments made in

the amount of $57,530.17.[19]

**6.**

---

[19]

| | |
|---|---|
| 1,190.61 | 8/3/07 |
| 14,084.89 | 8/31/07 |
| 14,084.89 | 10/2/07 |
| 14,084.89 | 10/30/07 |
| <u>14,084.89</u> | 11/26/07 |
| **$ 57,530.17** | |

Set out below is a summary of my calculation of the Unpaid Rent as of December 29, 2007 based upon the above discussion:

| | |
|---|---|
| Rent/Additional Rent & Storage through August 2007 | $ 135,658.43 |
| Rent September through November 2007 | $   63,024.95 |
| (Credit for Payments made by Debtor) | ($   57,530.17) |
| **Total** | **$ 141,153.21** |

## E.  Re-letting Costs and Mitigation of Damages Issue

Brandywine's seeks to include in its allowed claim, $156,290.00 for costs it incurred to re-let the Premises subject to a credit of $70,075.05[20] credit for rent and CAM received in mitigation. (See Ex. C-4).  For the following reasons, I am excluding both of these components from the allowable claim under the 11 U.S.C. §506(b)(6).

Collier states:

> Under §506(b)(6), a landlord with a claim for damages resulting from a debtor's breach of lease has an obligation to attempt to relet the premises, and **any resulting rents are deducted from the claim before the damage cap** of section 502(b)(6)(A) is calculated.

Collier ¶502.03[7][i] at 502-48-49 (emphasis added).

---

[20] I derived this number by adding the following line items in Brandywine's Calculation:

| | |
|---|---|
| Rent received in mitigation through Dec. 2008 | $ 27,360.12 |
| CAM received in mitigation | 388.31 |
| Rent received in mitigation Jan. - July 2009 | 41,706.23 |
| CAM received in mitigation | |
| Jan-April 2009 | 258.87 |
| May - July | 364.52 |
| | $ 70,075.05 |

In PPI Enterprises, 324 F.3d at 208 n.17, the Third Circuit Court of Appeals observed that the above construction of §502(b)(6) has been adopted by "the overwhelming majority of courts" and that "any mitigation of damages secured by reletting the premises will offset only the landlord's overall potential recovery, and does not affect the §502(b)(6) cap." See also Fifth Ave. Jewelers, 203 B.R. at 381 (citing cases).

Graf has presented no argument for departure from this accepted view. Thus, the credit for the rental payments received are simply irrelevant in deciding how much of Brandywine's claim is allowable under §502(b)(6).

Because rent received in mitigation are not considered under §502(b)(6), the "re-letting costs" incurred by Brandywine also must be excluded from the analysis. The two (2) amounts are the opposite sides of the same coin. The re-letting costs are simply cost incurred as part of mitigation and serve to reduce the benefits of mitigation to the defaulting tenant. Logically, if mitigation as a whole is not considered under §502(b)(6), there is no reason to consider any component of the mitigation calculation. Therefore, I will disallow all costs Brandywine incurred for re-letting (in an effort to mitigate its damages) and any credits to Graf for rent or CAM received from the new tenants.

## F.  Attorneys Fees and Costs

Finally, Brandywine requests that the court supplement the allowed claim determined under 11 U.S.C. §502(b)(6) by allowing an additional $83,584.55, representing the attorney's fees and costs that were included in the State Court Judgment.  Graf contends that the attorney's

fees and costs should be disallowed because they do not constitute either "rent" reserved nor unpaid "rent."

Graf's position, that attorney's fees and costs are not "rent" and that §502(b)(6) permits the allowance only of rent reserved and unpaid rent has some support in the case law.  See, e.g., Smith, 249 B.R. 328; In re PPI Enterprises (U.S.), Inc., 228 B.R. 339, 348-49 (Bankr. D. Del. 1998); In re Pacific Arts Publ., Inc., 198 B.R. 319, 324 (Bankr. C.D. Cal. 1996); Blatstein, 1997 WL 560119, at *16; McSheridan, 184 B.R. at 101.  However, as explained below, while I agree that attorney's fees and costs are not "rent," I construe §502(b)(6) to restrict only the "rent" component of a landlord's claim and not any other amounts that comprise the debt under applicable nonbankruptcy law.

I first look to the language of the statute which provides that "the court . . . shall allow such claim in such amount, except to the extent that — (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease." 11 U.S.C. §502(b)(6) (emphasis added). A plain reading suggests that §502(b)(6) restricts a lessor's allowable claim only insofar as the is for "damages resulting from the termination of a lease."  Id. (emphasis added).  In other words, "[a] claim held by a lessor which exists apart from the termination of a lease may, therefore, be allowed in its entirety, notwithstanding §502(b)(6), so long as the claim is not disallowed for any of those other reasons set forth in §502(b)." In re Brown, 398 B.R. 215, 218 (Bankr. N.D. Ohio 2008) (citing 4 Collier ¶502.03[7][a] (15th ed. 1998)); see also El Toro, 504 F.3d at 980 ("The cap applies to damages 'resulting from' the rejection of the lease."); In re Atlantic Container Corp., 133 B.R. 980, 987 (Bankr. N.D. Ill. 1991) ("The phrase [damages resulting from the termination of a lease] suggests that §502(b)(6) is intended to limit only those damages which the

33

lessor would have avoided but for the lease termination.").

The result derived from this plain meaning construction of §502(b)(6) is consistent with its purpose: to set a limitation on a specific component of a lessor's claims, i.e., future rent.  In Oldden v. Tonto Realty Corp., 143 F.2d 916, 918-20 (2d Cir. 1944), the Second Circuit set out the history of the treatment of landlord's claim in bankruptcy, leading to the amendment in 1934 of §502(b)(6)'s predecessor, §63a of the Bankruptcy Act, 11 U.S.C. §103(a) (repealed 1978), the purpose of which was to permit lessors' claims for future rent to be allowed, albeit in a limited fashion.  See also In re Best Products Co., Inc., 229 B.R. 673, 678 (Bankr. E.D. Va. 1998) (court stating it was "unable to find anything in the legislative history of the Bankruptcy Act or current code that overtly suggests Congress intended to do more than change common law rules of law so as to allow landlords to receive a limited portion of future rents in bankruptcy.")

As the Ninth Circuit framed the issue: "Assuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?"  El Toro, 504 F.3d at 981.  In El Toro, the court held that $23 million in damages caused by the tenant in removing equipment, waste and other materials was not limited by the rent cap of §502(b)(6) because it would have still existed even if the debtor accepted the lease (in bankruptcy) and committed to completing its terms.  Accord In re Energy Conversion Devices, Inc., 483 B.R. 119, 123 (Bankr. E.D. Mich. 2012) (collecting cases).

Here, the attorneys fees at issue arose from an award in the State Court Case that Brandywine brought against the Debtor for breaching the Lease.  The damages accrued while the Debtor was still obligated under the Lease prior to the surrender of the property in December

2007.  In short, the debt for these attorney's fees arose independently from the Debtor's failure to complete its term (or the Lease's termination).  Similarly, under the El Toro approach, these damages would have been part of any cure amount to be paid if the Lease were in existence and assumed in a bankruptcy case.  Therefore, the $83,584.55 for "Fees and Costs Awarded is not subject to the rent cap of §502(b)(6) and is allowed in its entirety.

## IV.  CONCLUSION

For the above reasons, Graf's objection to Brandywine's proof of claim is sustained, in part and Brandywine's claim will be disallowed in part pursuant to 11 U.S.C. §502(b)(6).  The claim will be allowed in the amount of **$400,171.94**, calculated as follows:

| | |
|---|---|
| "Rent Reserved " §502(b)(6)(A) | $ 175,434.18 |
| "Unpaid Rent"     §502(b)(6)(B) | $ 141,153.21 |
| "Attorney's Fees & Costs" | $  83,584.55 |
| **TOTAL** | **$ 400,171.94** |

An order consistent with this Opinion will be entered.

Date:  <u>January 17, 2013</u>

ERIC L. FRANK
UNITED STATES BANKRUPTCY JUDGE